NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: October 4, 2022

S22Y1159. IN THE MATTER OF TRENT LEE COGGINS.

PER CURIAM.

This disciplinary matter is before the Court on the report and recommendation of Special Master Jack J. Helms, Jr., who recommends that the Court accept the petition for voluntary discipline filed by respondent Trent Lee Coggins (State Bar No. 173299) pursuant to Bar Rule 4-227 (c) after the filing of a formal complaint. Coggins asks that the Court impose a suspension of six months, nunc pro tunc to September 1, 2021, for his admitted violations of Rules 1.15 (I) (a) – (b), and 1.15 (II) (a) – (c), of the Georgia Rules of Professional Conduct found in Bar Rule 4-102 (d). The maximum penalty for a violation of Rules 1.15 (I) and 1.15 (II) (a) and (b) is disbarment. The maximum penalty for a violation of Rule 1.15 (II) (c) is a public reprimand.

In his report, the Special Master made the following findings of fact:

Coggins, who has been a member of the Bar since 2001, owned his own law practice and represented clients in commercial and residential real estate transactions, acting at times as a closing attorney and receiving and disbursing client and third-party funds required to be held in an IOLTA account. Coggins maintained two IOLTA accounts with Guardian Bank of Valdosta ("Guardian Bank").

On May 27, 2016, Coggins acted as the closing attorney on the sale of four residential lots owned by Palm Beach Development, LLC ("PBD"), which were part of a 41-lot parcel owned by PBD. At the time of the sale, Coggins's client was and remains the sole member of PBD.

Several years prior to the sale, in 2010, the client borrowed $136,555.24 from a third party (the "Loan"). Although Coggins was not involved in either the origination or the closing of the Loan, Coggins understood that the Loan was secured by PBD's ownership

2

interest in the 41-lot parcel and that his client had provided the third party with a security deed to the 41 lots as collateral for the Loan.

Additionally, prior to the May 2016 closing, Coggins was present and overheard a telephone conversation between his client and the third party in which they discussed applying the proceeds of the sale of the four lots towards repayment of the Loan. Coggins believed that the third party would release the four lots from the security deed upon application of the proceeds of the sale of those lots toward repayment of the Loan. Indeed, in connection with this disciplinary matter, the third party represented to the State Bar that he agreed to accept the proceeds of the sale of the four lots as payment towards the debt. Coggins's client also affirmatively represented in an affidavit to the State Bar that, at the time of the May 2016 closing, he was under the impression that a written release was sent to the third party. The client further represented to the State Bar that, in June 2017, the third party acknowledged having received a release. However, notwithstanding the client's

3

representations to the State Bar, Coggins admits that the record in this case does not include a written release, and no such release ever existed.

Following the closing on May 27, 2016, Coggins deposited $49,898.91 into one of his IOLTA accounts at Guardian Bank, which amount represented the gross proceeds from the sale of the four lots. On the same day, Coggins wrote several checks from this IOLTA account in connection with the closing, including Check No. 5016 in the amount of $33,096.94 made payable to the third party, which Coggins understood would be applied as partial repayment of the Loan. According to the third party, sometime after the closing in 2016, he attempted to negotiate Check No. 5016 at a Regions Bank, but the teller informed him that the IOLTA account did not have sufficient funds for the check to be honored.

More than a year later, in June 2017, the third party contacted Coggins's client and requested a replacement check, representing that Check No. 5016 had been dishonored by the bank due to the length of time that had elapsed since it was issued. The client told

4

the third party that he would request a replacement check from Coggins, but the client did not do so.

Almost three years later, on May 14, 2019, the third party, through counsel, sent Coggins a written demand to replace Check No. 5016, maintaining that the check had been dishonored for insufficient funds. Coggins contacted the third party's counsel and offered to tender the amount of the check—i.e., $33,096.94— immediately, but the third party refused the offer, purportedly in order to pressure Coggins's client to repay the full amount due on the Loan.

On May 30, 2019, the third party commenced foreclosure proceedings against the 41-lot parcel, setting July 2, 2019, as the date of the non-judicial foreclosure sale. The day before the sale, Coggins, on behalf of his client, wired $208,853.15 from his IOLTA account to the third party in full settlement of the Loan. The third party and Coggins's client agreed that $33,096.94 of the $208,853.15 would satisfy the net proceeds due to the third party in connection with the May 27, 2016 closing of the four lots.

While the issue of whether Check No. 5016 was actually dishonored by the bank remains in dispute,[1] Coggins admitted that on 35 occasions between December 2016 and June 2019, the average daily balance of his IOLTA account dropped below $33,096.94, such that he would have had insufficient funds to cover the obligation to the third party in connection with the May 27, 2016 closing. According to Coggins, the shortfall in funds in his IOLTA account on those occasions was caused by his lack of understanding of proper trust account management, which resulted in his failure to maintain a ledger of every transaction and a failure to reconcile the IOLTA account on a regular basis.

Coggins also admitted that between June 2019 and October 2019, he transferred unearned client funds from the IOLTA account into his business operating account, which he used in support of his other business interests that were at risk of financial collapse.

---

[1] According to an affidavit of an employee of Guardian Bank submitted in connection with these disciplinary proceedings, the bank has no record of Check No. 5016 having ever been presented through the bank's tracking system, and thus, it was never dishonored.

Coggins explained that, in 2019, he was involved in a high-profile development project in his community that unexpectedly required an infusion of capital, and his only two options were either to go into default with the project sponsors—facing a very public embarrassment and damage to his reputation—or borrow funds from the IOLTA account. Coggins acknowledged that he made the wrong choice and explained that he did so based on his fear of being humiliated in the community where he has lived, raised a family, and practiced law for over 20 years. The parties acknowledged that Coggins had made restitution for each unauthorized transfer from the IOLTA account and that all parties have been made whole.

The Special Master concluded that Coggins admitted that he violated Rule 1.15 (I) (a) by failing to maintain third-party funds and other client funds in his IOLTA account at all times and keep those funds separate from his own funds, and by failing to keep and preserve complete records of those funds held in his IOLTA account. In addition, Coggins admitted that he violated Rule 1.15 (I) (b) when he disregarded the third party's interest in the $33,096.94 by not

7

maintaining it at all times in the IOLTA account and by not keeping it separate from his personal funds. Moreover, Coggins admitted to violating Rule 1.15 (II) (a) by administering part of the funds held for the third party in his IOLTA account to someone other than the third party without authorization. He also admitted to violating Rule 1.15 (II) (b) by depositing personal funds into the IOLTA account; holding personal funds in his IOLTA account beyond the time when they were earned; failing to maintain a ledger for the IOLTA account showing the balances held for each client or third person; and withdrawing funds from the IOLTA account for personal use that were not earned fees debited against the account of a specific client and recorded as such. Finally, Coggins admitted that he violated Rule 1.15 (II) (c) in that the funds he held in the IOLTA account were not available for the third party to withdraw upon request without delay.

The Special Master stated that he relied on the ABA Standards for Imposing Lawyer Sanctions for guidance in determining the appropriate level of punishment in this disciplinary case, see *In the*

*Matter of Morse*, 266 Ga. 652 (470 SE2d 232) (1996), noting that he would consider the duties violated (as recited above), Coggins's mental state, the actual or potential injury caused by his misconduct, and the aggravating and mitigating factors. See ABA Standard 3.0.

As for Coggins's mental state, the Special Master concluded that Coggins admitted that he knowingly and intentionally misused client and third-party funds to prevent the failure of his business venture, but that some of his violations also arose from his failure to appreciate the importance of trust account management according to the requirements of Rules 1.15 (I) and 1.15 (II), which sounded in negligence.

As for the actual or potential injury caused, the Special Master concluded that given the third party's apparent inaction for three years, it did not appear that he had suffered any actual injury in 2016 when he may or may not have attempted to negotiate Check No. 5016; however, even assuming that he never tried to cash the check, the Special Master concluded that the third party still

suffered some actual injury when the $33,096.94 went unpaid for a period of time following his counsel's specific, written demand for payment. As for potential injury, the Special Master also noted that Coggins admitted that the third party was exposed to potential financial harm by virtue of Coggins not maintaining sufficient funds to cover Check No. 5016 at all relevant times; that the owners of the four lots were also exposed to injury when the third-party's counsel initiated non-judicial foreclosure against those properties; and that the deficit in the trust account had the potential to undermine the integrity of the significant funds Coggins held on deposit for numerous clients and third persons between 2016 and 2019.

As for aggravating factors, the Special Master considered Coggins's substantial experience in the practice of law and his dishonest and selfish motive in using client funds to pay for his business interests. See ABA Standard 9.22 (b) and (i). As for mitigating factors, the Special Master considered Coggins's personal problems—primarily his lapse of judgment in fearing public

humiliation[2]—which the Special Master concluded provided a limited degree of mitigation, and the fact that Coggins made a timely, good faith effort to make restitution and rectify the consequences of his misconduct. See ABA Standard 9.32 (c) and (d). In addition, the Special Master noted that Coggins had submitted character references that attested to his professionalism, integrity, and commitment to public services and that he had shown genuine remorse. See ABA Standard 9.32 (g) and (l).

As for the level of discipline, the Special Master determined that, while this Court "views trust account violations as exceptionally serious" and the maximum penalty for any "single violation" of Rules 1.15 (I) or 1.15 (II) is disbarment, disbarment is generally reserved for the most egregious circumstances. *In the Matter of Coulter*, 304 Ga. 81, 83 (816 SE2d 1) (2018). See also, e.g., *In the Matter of Hunt*, 304 Ga. 635 (820 SE2d 716) (2018) (concluding that disbarment was appropriate where multiple aggravating

---

[2] We question whether the fear of public humiliation from financial losses is truly a mitigating circumstance, but given the other mitigating circumstances, it does not change the result here.

11

factors existed and the attorney, who was entrusted with a minor's settlement proceeds, spent the entire sum on personal and business expenses); *In the Matter of Wathen*, 290 Ga. 438 (721 SE2d 899) (2012) (holding that disbarment was appropriate where no mitigating factors and numerous aggravating factors were found, and the attorney settled a claim without the client's authority and converted the settlement proceeds for the attorney's personal use).

The Special Master concluded that, in marked contrast, where the totality of the circumstances supported less severe discipline, this Court has without hesitation imposed a suspension or reprimand for trust account violations. See, e.g., *In the Matter of Terrell*, 291 Ga. 91 (727 SE2d 499) (2012) (imposing six-month suspension where attorney settled case for $98,250 and deposited funds into IOLTA account but failed to maintain sufficient funds to cover obligation during six-month period; attorney provided prompt restitution, lacked prior discipline, and references supported attorney's good character); *In the Matter of Summers*, 278 Ga. 57 (597 SE2d 364) (2004) (six-month suspension imposed where

attorney held client funds in IOLTA account for over four years, during which time the account at times contained insufficient funds to cover the obligation, but attorney made restitution, cooperated with State Bar, and expressed remorse); *In the Matter of Drucker*, 274 Ga. 536 (556 SE2d 129) (2001) (imposing six-month suspension where attorney converted client settlement funds and ignored numerous client requests for funds, but where attorney had repaid the funds, had no prior disciplinary history, and personal and emotional factors were present); *In the Matter of deRosay*, 268 Ga. 868 (494 SE2d 339) (1998) (imposing six-month suspension where attorney wrote checks to himself against IOLTA account but made complete restitution, filed petition for voluntary discipline and was cooperative, expressed remorse, had no disciplinary record, and demonstrated mitigating personal issues).

Here, the Special Master concluded that Coggins's misconduct, although certainly serious, was mitigated by a number of considerations that tended to offset or deemphasize the aggravating factors, including his restitution, general acceptance of

responsibility, remorse, and lack of any prior disciplinary history. Thus, the Special Master determined that a six-month suspension was appropriate. Moreover, the Special Master concluded that it would be appropriate for the suspension to be imposed nunc pro tunc to September 1, 2021, the date that Coggins stopped practicing law, by closing his law office and his trust accounts, and withdrawing properly from all representations. Coggins appended to his Petition for Voluntary Discipline sworn evidence that documented the termination of his law practice. See *In the Matter of Onipede*, 288 Ga. 156, 157 (702 SE2d 136) (2010) ("[W]hen an attorney requests [discipline] nunc pro tunc, it is the lawyer's responsibility to demonstrate that [he] voluntarily stopped practicing law, the date on which [his] law practice ended, and that [he] complied with all the ethical obligations implicated in such a decision, such as assisting clients in securing new counsel and facilitating the transfer of client files and critical information about ongoing cases to new counsel."). The State Bar indicates that it does not oppose the imposition of a six-month suspension, nunc pro tunc to

September 1, 2021.

We have reviewed the record and agree that a six-month suspension, nunc pro tunc to September 1, 2021, is an appropriate sanction for Coggins's violations. Accordingly, we hereby accept Coggins's petition for voluntary discipline and order that Coggins be suspended from the practice of law nunc pro tunc to September 1, 2021. Given that Coggin's six-month suspension would now be completed, he is also hereby reinstated.[3]

*Petition for voluntary discipline accepted. Six-month suspension nunc pro tunc; reinstated. All the Justices concur.*

---

[3] However, given Coggins's lack of understanding of proper trust account management, we urge him to utilize the State Bar's Law Practice Management Program and other resources designed to prevent a future failure to meet the professional obligations of a Georgia lawyer.